IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

GREENENA GREENE, Individually     *
and as the Natural Mother of     *
Baby Carson Greene, deceased; and     *
REGINALD HINTON, SR., Individually     *
and as the Natural Father of     *
Baby Carson Greene, deceased,     *
    *
              Plaintiffs,     *     CASE NO:
    *
vs.     *
    *
UNITED STATES OF AMERICA;     *
    *
              Defendants.     *

## COMPLAINT

Plaintiffs, Greenena Greene and Reginald Hinton, Sr., individually and as the natural parents of Baby Carson Greene, deceased, file this, their Complaint, against Defendant United States of America showing this Honorable Court the following:

## PARTIES, JURISDICTION AND VENUE

### 1.

Plaintiffs Greenena Greene and Reginald Hinton, Sr. are residents of Montezuma, Macon County, Georgia and are subject to the jurisdiction of this Court.

### 2.

This complaint arises from medical negligence which occurred in Americus, Sumter County, Georgia. The cause of action arises from tortious conduct committed by government employees who were acting within the scope of their employment pursuant to 28 U.S.C. §§ 1346(b), 2401(b), 2671-2680, the Federal Tort Claim Act and violations of the Georgia medical

1

malpractice laws.

3.

Defendant United States of America operates and/or funds CareConnect Health, Inc., d/b/a Americus OBGYN, ("CCH") under the Federally Supported Health Centers Assistance Act of 1992 and 1995 ("FSHCA").

4.

Defendant United States of America is the employer of all employees of CCH under 28 U.S.C. § 1356(b)(1).

5.

CCH's Americus OBGYN office is located at 603 East Lamar Street, Americus, Georgia.

6.

At all times material, Angela McDowell, M.D. ("McDowell") was a Georgia licensed physician whose specialty is obstetrics and gynecology and was an employee of CCH and Defendant United States of America.

7.

At all times material, Dr. McDowell was required to exercise a reasonable degree of medical care and skill in her care and treatment of her patients, Plaintiff Greenena Greene and Baby Carson Greene, deceased.

8.

At times material, Dr. McDowell was acting within the scope of her employment with CCH and Defendant United States of America.

9.

At all times material, Lynette Talley, CNM ("Talley") was a midwife licensed to practice

2

in the State of Georgia and was an employee of CCH and Defendant United States of America.

10.

At all times material, Ms. Talley was required to exercise a reasonable degree of medical care and skill in her care and treatment of her patients, Plaintiff Greenena Greene and Baby Carson Greene ("Baby Carson"), deceased.

11.

At times material, Ms. Talley was acting within the scope of her employment with Defendant United States of America.

12.

Jurisdiction of Plaintiffs' claims for medical malpractice lies in the Middle District of Georgia, Albany Division, under 28 U.S.C. § 1356(b)(1), the FSHCA and the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 ("FTCA").

13.

On June 22, 2021, Plaintiffs submitted an administrative claim with the United States Department of Health & Human Services.

14.

On June 24, 2021, the United States Department of Health & Human Services signed for, and received, the administrative claim, via certified mail.

15.

On February 8, 2022, Defendant United States of America denied Plaintiffs' claims.

## FACTS

16.

At all times material, CCH held itself out as being a facility that was able to provide

3

specialized and comprehensive obstetrical and gynecological services, including medical, nursing, diagnostic testing and other medical services necessary to evaluate, diagnose and treat patients such as Greenena Greene and Baby Carson.

17.

CCH provided obstetrical and gynecological services to Ms. Greene prior to, and during, the pregnancy, labor and delivery of Baby Carson.

18.

Dr. McDowell provided obstetrical and gynecological services to Ms. Greene prior to, and during, the labor and delivery of Baby Carson.

19.

Ms. Talley provided obstetrical and gynecological services to Ms. Greene prior to, and during, the labor and delivery of Baby Carson.

20.

At all times material to the prenatal care, labor and delivery of Baby Carson, Dr. McDowell and Ms. Talley were employees of Defendant United States of America and provided medical care to Plaintiff Greenena Greene and Baby Carson at Americus OBGYN and Phoebe Sumter Medical Center in Americus, Georgia.

21.

Throughout the prenatal care, labor, delivery and post-delivery care of Greenena Greene and Baby Carson, Defendant United States of America, through its employees and agents at CCH, had a duty to provide adequate, sufficient and non-negligent medical, diagnostic and other health-related care to Greenena Greene and Baby Carson.

22.

Plaintiff Greenena Greene had been a patient of CCH since February 28, 2018 for routine gynecological treatment and care.

23.

On March 2, 2020, Plaintiff Greenena Greene presented to CCH with a positive pregnancy test and first obstetric appointment for the pregnancy of Baby Carson. At that time, Baby Carson's estimated gestational age was 8 weeks and 5 days and an estimated due date was October 7, 2020.

24.

During her prenatal care, Greenena Greene was examined and/or seen at CCH by employees and/or agents of Defendant United States on 3/2/2020, 3/25/2020, 6/3/2020, 6/17/2020, 7/1/2020, 7/16/2020, 7/30/2020, 8/11/2020, 8/17/2020, 8/26/2020, 9/4/2020, 9/9/2020 and 9/21/2020.

25.

During the above-listed prenatal visits, there were no issues or concerns relating to the health or viability of Baby Carson.

26.

On September 22, 2020, Greenena Greene presented to Phoebe Sumter Medical Center at approximately 0417 hours with complaints of lower abdomen pain. At that time, Baby Carson was 37 weeks and 6 days gestational age and was reported to have fetal movement upon arrival to the medical center.

27.

At approximately 0500 hours, Ms. Talley examined Greenena Greene. The examination showed that Ms. Greene was 1 cm dilated, 50% effaced and Baby Carson was at a -3 station. At

that time, Ms. Greene's membranes had not ruptured and there was no evidence of blood or fluid leakage.

28.

During this 0500 hours consultation with Ms. Talley, a monitor was attached to Ms. Greene to record the contraction pattern and Baby Carson's heart rate. At the time the monitor was applied, Ms. Greene's contractions were coming very quickly with evidence that her uterus was in an abnormally hyper-stimulated state (known as tachysystole) even though no Pitocin had been administered.

29.

At approximately 0600 hours, Baby Carson had an episode of bradycardia (low heart rate) and Ms. Greene's contractions continued in a tachysystolic pattern.

30.

At 0615 hours, Baby Carson's fetal heart rate was improved and Ms. Talley was at Ms. Greene's bedside. Ms. Greene reported 10/10 pain in the left upper quadrant of her abdomen and her contractions continued in a tachysystolic pattern. Ms. Talley ordered pain and nausea medication for Ms. Greene's 10/10 pain.

31.

At 0645 hours, Ms. Greene's tachysystolic pattern of contractions continued, and Heather Dean, R.N. spoke to Ms. Talley and Dr. McDowell about Ms. Greene's condition. At that time, orders were given to infuse a bolus of Lactated Ringer's which can help space contractions further apart. At this time, Ms. Greene's 10/10 pain was unrelieved despite the medication given.

32.

At approximately 0700 hours, the bolus of Lactated Ringer's was given. At this time, Ms.

Greene was having up to eight (8) contractions in ten (10) minutes with little to no resting time in between, and her resting tone was firm. This is an indication that the uterus is not relaxing between contractions as it should.

33.

At approximately 0730 hours, nursing care was transferred from Heather Dean to Kathryn Renee Higgins. Despite the documented transfer in care of the nursing staff, it is unclear from the chart whether Ms. Talley continued to be involved in monitoring Ms. Greene's labor or whether Ms. Talley transferred care to another midwife. At this time, there was a loss of fetal heart rate on the fetal monitoring strips.

34.

At 0800 hours, the fetal heart rate was back to 115 (normal). Ms. Greene's contractions continued in a tachysystolic pattern, and there was evidence of hypertonic contractions (abnormal contractions characterized by poor and inadequate contractions that are ineffective to cause cervical dilation, effacement and fetal descent) with minimal to no resting time between them.

35.

During the hypertonic contractions, Ms. Greene requested pain medication for 10/10 pain and tenderness now on her right side.

36.

From 0802 until 0819 hours, there was a prolonged deceleration of Baby Carson's fetal heart rate, which ultimately returned to the 150s.

37.

At 0839 hours, Ms. Greene was once again medicated for 10/10 pain in her abdomen. Ms. Greene was transported to the labor and delivery floor on a stretcher. When moved to a bed, Ms.

Greene experienced vaginal bleeding with clots.  At this time, Dr. McDowell was notified.

38.

At 0853 hours, Dr. McDowell arrived at Ms. Greene's bedside.  At the time Dr. McDowell assessed Ms. Greene, there had been an ongoing tachysystolic pattern for more than two hours, non-reassuring fetal monitor tracings and bleeding with clots.

39.

At approximately 0900 hours, Dr. McDowell decided that a Cesarean (C-section) delivery was necessary.  Dr. McDowell also determined that Ms. Greene and Baby Carson were stable enough to wait for placement of a "spinal" anesthetic.  At the time this decision was made, Dr. McDowell noted that the fetal heart tones were in the 130s with moderate variability, positive accelerations and small decelerations.

40.

Baby Carson's fetal heart rate remained normal with good variability until Ms. Greene sat up for her spinal placement.  After the spinal was placed, the fetal heart rate could not be found.

41.

At 0939 hours, Dr. McDowell delivered Baby Carson as a non-viable fetus.

## COUNT I – PROFESSIONAL NEGLIGENCE

42.

Plaintiffs re-allege and incorporate by reference the allegations of paragraphs one (1) through forty-one (41) above.

43.

At all times material, Defendant United States of America's agents and/or employees held themselves out as having that degree of professional skill appropriate for the provision of health care services to patients, including Greenena Greene and Baby Carson.

44.

Throughout the prenatal care, labor and delivery care of Greenena Greene and Baby Carson, Defendant United States of America, through its employees and agents of CCH, had a duty to provide adequate, sufficient and non-negligent medical, diagnostic and other health-related care to Ms. Greene and Baby Carson.

45.

Defendant United States of America, through its agents and/or employees, had a duty to provide adequate, sufficient and non-negligent medical, diagnostic and other health-related care to patients Greenena Greene and Baby Carson within the applicable standards of care.

46.

Defendant United States of America, through its agents and/or employees, undertook and agreed to provide prenatal, labor and delivery care to Greenena Greene and Baby Carson.

47.

In providing such services, Defendant United States of America, through its agent and/or employee physicians, including Dr. McDowell, deviated from the standards of care in its care and treatment of Greenena Greene and Baby Carson in the following ways:

    a.    Failure to come to the bedside to evaluate Greenena Greene and the condition of Baby Carson when, at 0645 hours, Dr. McDowell was notified of the episode of fetal bradycardia, Ms. Greene's tachysystolic contraction pattern and significant pain unrelieved by medication;

    b.    Failure to recognize, by 0645 hours, that Ms. Greene's tachysystolic contraction pattern and significant pain unrelieved by medication, combined with the episode of fetal bradycardia were signs that a placental

abruption occurred or Ms. Greene was at immediate risk of placental abruption;

c.    Failure to recognize, by 0645 hours, that Ms. Greene needed an emergent C-section to avoid the risk of an in-utero fetal demise;

d.    Failure to arrange for coverage by another physician when Dr. McDowell knew, or should have known, that Ms. Greene required an emergent C-section and Dr. McDowell had another patient also in labor;

e.    Failure to arrange for coverage by a certified nurse-midwife with whom Dr. McDowell could stay in contact or assign a certified nurse-midwife to Ms. Greene after 0700 hours to allow for close monitoring of Ms. Greene and Baby Carson until such time as Dr. McDowell could make arrangements for Baby Carson to be delivered by C-section;

f.    Improperly assuming that, because Baby Carson had a good heart rate at 0645 hours and thereafter, he was not at risk of in-utero fetal demise due to placental abruption under the circumstances;

g.    Improperly assessing Ms. Greene and Baby Carson as "stable" at 0900 hours and ordering a spinal when Dr. McDowell knew, or should have known, that to do so would delay delivery, putting both mother and baby at risk of harm; and

h.    Failure to timely perform a C-section.

48.

In providing such services, Defendant United States of America, through its agent and/or employee nurse midwives, including Ms. Talley, deviated from the standards of care in its care and treatment of Greenena Greene and Baby Carson in the following ways:

a.    Failure to timely recognize Ms. Greene's persistent tachysystolic contraction pattern as a sign of placental abruption or as an indicator that Ms. Greene was at risk of having a placental abruption and that a C-section was indicated as early as 0630 hours;

b.    Failure to timely notify Dr. McDowell of Ms. Greene's persistent tachysystolic contraction pattern and request Dr. McDowell to personally come to the bedside to evaluate the patient and prepare for a C-section delivery;

10

c.  Failure, after 0645 hours, to timely communicate with Dr. McDowell that the tachysystolic contraction pattern continued despite fluid boluses and that Ms. Greene's 10/10 pain continued despite pain medication;

d.  Failure of Ms. Talley to stay with Ms. Greene after shift change at 0700 hours, when she knew, or should have known, that Ms. Greene was at risk for a placental abruption, or alternatively, to transfer the care of Ms. Greene and Baby Carson to another nurse midwife until Dr. McDowell, or another physician, arrived at bedside to initiate a C-section delivery; and

e.  Failure of Ms. Talley, or another midwife to whom she transferred the care and monitoring of Ms. Greene, to timely use the chain of command to intervene on Ms. Greene's behalf when they knew Dr. McDowell was unwilling or unavailable to perform a timely C-section.

49.

As a direct and proximate result of Defendant United States of America's agents and/or employees' negligence as set forth hereinabove and as specified in the attached expert affidavit, Baby Carson wrongfully died, and as a result, Defendant is liable to Plaintiffs for the full value of Baby Carson's life and any unnecessary medical expenses suffered by Plaintiffs.  As a further direct and proximate result of Defendant's negligence and resulting death of Baby Carson, both Plaintiffs suffered, and continue to suffer, the emotional pain and suffering, shock, sadness and other emotional injuries and suffering, both past and future, for witnessing Baby Carson preventable death.

50.

Plaintiff Greenena Greene sustained a direct physical impact and physical injuries because of the deviations from the prevailing standards of care described above.

51.

Plaintiffs Greenena Greene and Reginald Hinton, Sr., as the parents of Baby Carson, are entitled to recover all damages allowed by Georgia law (including damages for Ms. Greene's physical injuries, pain and suffering, and serious emotional distress) for witnessing Baby Carson's

11

preventable death, which was caused by the negligent and substandard care provided by Defendant United States of America.

52.

Although an O.C.G.A. § 9-11-9.1 affidavit is not required in federal court, attached to this Complaint is the affidavit of an expert competent to testify setting forth "at least one negligent act or omission claimed to exist and the factual basis for each such claim" against Defendant United States of America's agents and/or employees, Dr. McDowell and Ms. Talley.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand and pray as follows:

A.      The full value of the life of their child, Baby Carson, in an amount to be determined by the enlightened conscience of a fair and impartial jury;

B.      The full value of the pain and suffering, including mental and emotional distress, in an amount to be determined by the enlightened conscience of a fair and impartial jury;

C.      The medical expenses that Plaintiff Greenena Greene incurred for herself and Baby Carson;

D.      That Plaintiffs obtain judgment in an amount deemed to be just and proper for all damages allowable under Georgia law;

E.      That Plaintiffs recover the costs of this action;

F.      That process issue and that Defendants be served in accordance with  law; and

E.      That Plaintiffs receive such other and further relief as this Court deems fair, just, and equitable.

This 6th of June, 2022.

                                **SPOHRER & DODD, P.L.**

                                s/Jay M. Howanitz
                                Jay M. Howanitz
                                Attorney for Plaintiff
                                State Bar #119758
                                76 South Laura Street, Suite 1701
                                Jacksonville, Florida 32202
                                Telephone:     (904) 309-6500
                                Facsimile:     (904) 309-6501
                                Email:           jhowanitz@sdlitigation.com

13

## AFFIDAVIT OF STEVEN PLISKOW, M.D.

STATE OF FLORIDA
COUNTY OF PALM BEACH

      BEFORE ME, the undersigned authority, personally appeared Steven Pliskow, M.D., to me well known, who, having first been duly sworn, deposes and says:

      1.    I am Steven Pliskow.  I am a medical doctor specializing in obstetrics and gynecology.  I am licensed to practice medicine by the State of Florida and have been so licensed continuously since 1988.  I have been actively and continuously practicing medicine in the field of obstetrics and gynecology in the State of Florida since 1990 and have been board certified by the American Board of Obstetrics and Gynecology since 1992.  Additionally, I am a Diplomat of the American Board of Obstetrics and Gynecology, a Diplomat of the American Board of Forensic Medicine, a Fellow of the American College of Obstetrics and Gynecology and a Fellow of the American College of Forensic Examiners.

      2.    I have published several articles in obstetrics and gynecologic peer reviewed journals.  I have served as Chairman of the Quality Assurance Committee at Palms West Hospital from 1996 – 1998 and have been the Chairman of the Department of Obstetrics and Gynecology at Palms West Hospital from 2010 – 2012.  I have served as a clinical instructor at Lake Erie College of Osteopathic Medicine, Nova Southeastern College of Osteopathic Medicine, Kansas City University of Medicine, and the Philadelphia College of Osteopathic Medicine-Georgia Branch teaching obstetrics and gynecology to medical students.  I am currently a clinical instructor for Palm Beach graduate Medical Education, teaching obstetrics and gynecology to 3rd year medical students from Kansas City University of Medical Biosciences, post-graduate year one interns in the St. Lucie Hospital Emergency Medicine Residency Program, the Palms West Hospital Pediatric Residency Program and the West Palm Hospital Family Practice Residency Program. I am also a clinical instructor for obstetrics and gynecology at Nova Southeastern School of Medicine. As part of my position at Palms West

Hospital, I am responsible for the continued training and education of our obstetric nurses. A copy of my *curriculum vitae* is attached.

3.      I have reviewed various records pertaining to Greenena Greene and Carson Hinton, including without limitation:

A.      Greenena Greene's records from Americus OB/GYN dated February 28, 2018 - September 30, 2020.

B.      Greenena Greene's records from her Phoebe Sumter Medical Center admission dated September 22, 2020 – September 24, 2020 as follows:

i.  Face sheet and prenatal excerpts, Discharge Summary

ii.  History & Physical w/ Addendum by Dr. McDowell

iii.  OB Progress Note by Crystal Settle, CNM

iv.  Fetal Monitor Strips & Nursing Surgical Chart

v.  Anesthesia Records, Operative Note & Pathology Report

vi.  Neonatal Resuscitation Record

vii.  Narrative Nursing Notes (admission through 1603)

viii.  I&O record for 9/22-23/20, Labs, Orders 0524-0902, MAR pp. 1-16

ix.  Nursing Interventions pp. 1-8, 10-13, 35-39, 42-49, 97-100, 121-126, and 152-153,

4.      As the result of having been regularly engaged in the practice of obstetrics for the five-year period before 2012 (and for many years before that), I have considerable professional knowledge and experience in evaluating and treating pregnant patients, monitoring the well-being of both mother and baby throughout the pregnancy, labor and delivery, and the indications for c-section and emergent c-section deliveries.

5.      In my obstetric practice for the three (3) year period immediately preceding the admission of Greenena Greene to Phoebe Sumter Medical Center on September 22, 2020 (and for many years before that), I have frequently and regularly been engaged in the diagnosis,

assessment, monitoring and treatment of patients such as Greenena Greene and her baby, Carson Greene Hinton.  During this time period, based on the history of the mother, her prior birthing experiences, and the prenatal development of the fetus, I have regularly and frequently reviewed evidence of the well-being of both mother and child during labor and, based on available evidence of abnormal fetal heart tracings, recommended a c-section delivery or an emergent c-section delivery.

6.      In my obstetric practice for the three (3) year period immediately preceding the admission of Greenena Greene to Phoebe Sumter Medical Center on September 22, 2020 (and for many years before that), I have been involved in the evaluation of the clinical practice of Certified Nurse Midwives through our hospital Quality Assurance Committee.

7.      I am very familiar, through my education, training, experience and knowledge of the medical literature, with the accepted standards of care which should be met by obstetricians and nurse midwives when determining when a child has abnormal fetal heart tracings and should be delivered by c-section or emergent c-section.

8.      I am very familiar, through my education, training, experience and knowledge of the medical literature, with the accepted standards of care which should be met by Certified Nurse Midwives in the conduct of the care provided a patient such as Greenena Greene.

9.      A review of the records identified herein revealed that Greenena Greene entered Phoebe Sumter Medical Center at approximately 0417 on September 22, 2020. At that time, Ms. Greene was 37 weeks and 6 days gestational age. Ms. Greene reported fetal movement upon arrival to the hospital.

10.     Ms. Greene called prior to her arrival and certified nurse midwife Lynette Talley was notified.  At about 0500, Ms. Talley examined Ms. Greene who was complaining of a lot of pain in her lower abdomen.  The exam showed that Ms. Greene was 1 cm dilated, 50% effaced and the fetus was a -3 station.  Ms. Greene's membranes had not ruptured and there was no evidence of blood or fluid leakage.

A monitor was applied to record the contraction pattern and the fetus's heart rate.  At the time the monitor was applied, Ms. Greene's contractions were coming very quickly with evidence that her uterus was in an abnormally hyper-stimulated state (known as tachysystole), although no Pitocin had been administered.  At approximately 0600, the baby had an episode of bradycardia (low heart rate) and the mother's contractions continued in a tachysystolic pattern. At 0615, the fetal heart rate was improved and midwife Talley was at Ms. Greene's bedside. Ms. Greene reported 10/10 pain in the left upper quadrant of her abdomen.  Her contractions continued in a tachysystolic pattern.  Midwife Talley ordered pain and nausea medication for Ms. Greene's 10/10 pain.

At 0645, the tachysystolic pattern of contractions continued and Nurse Dean spoke to midwife Talley and Dr. Angela McDowell about Ms. Greene's condition.  Orders were given to infuse a bolus of lactated ringers which can help space contractions further apart. Ms. Greene's 10/10 pain was unrelieved despite the medication given.

At about 0700, the bolus was given.  Ms. Greene was having up to eight (8) contractions in 10 minutes with little to no resting time in between and her resting tone was firm.  This is an indication that the uterus is not relaxing between contractions as it should.

At about 0730, nursing care was transferred from Nurse Dean to Nurse Higgins.  It is unclear from the chart whether midwife Talley continued to be involved in monitoring Ms. Greene's labor, or whether she transferred care to another midwife.  At or about this time, there appears to be a loss of fetal heart rate on the strips.  The fetal heart rate when checked at 0800 was 115 (normal), however the contractions continued in a tachysystolic pattern and there was evidence of hypertonic contractions with minimal to no resting time in between them.  Ms. Greene requested pain medication for 10/10 pain and tenderness, now on her right side.  From 0802 until 0819, there was a prolonged deceleration of the fetal heart rate, which ultimately returns to the 150's.

At 0839, Ms. Greene was once again medicated for 10/10 pain in her abdomen. Ms. Greene was transported to the labor and delivery floor on a stretcher. When moved to a bed, she experienced vaginal bleeding with clots. Dr. McDowell was notified and arrived at bedside at 0853. At the time Dr. McDowell assessed Ms. Greene, there had been an ongoing tachysystolic pattern for more than two hours, non-reassuring fetal monitor tracings and now bleeding with clots.

At about 0900, Dr. McDowell decided that a c-section was necessary. She also determined that Ms. Greene and her baby were stable enough to wait for placement of a spinal. At the time this decision was made, Dr. McDowell noted that the fetal heart tones were in the 130s with moderate variability, positive accelerations and occasional small decelerations. The fetal heart rate remained normal with good variability until Ms. Greene sat up for her spinal placement. After the spinal was placed, the fetal heart rate could not be found. Dr. McDowell delivered a non-viable fetus at 0939.

11.    After a thorough review of the above-stated documents and based on my education, experience, knowledge, and training as detailed herein, and in consideration of the information available regarding Greenena Greene's obstetrical history and the course of her labor, it is my opinion that Lynette Talley, CNM and any other nurse midwife who may have been involved in the care of Ms. Greene from about 0700 until 0915, deviated from the standards of care for Nurse Midwives in their care and treatment of Greenena Greene and her baby, Carson Hinton, in the following respects:

A.    Failure to timely recognize Ms. Greene's persistent tachysystolic contraction pattern as a sign of placental abruption or indicating Ms. Greene was at risk of having a placental abruption and that a c-section was indicated as early as 0630;

B.    Failure to timely notify Dr. McDowell of Ms. Greene's persistent tachysystolic contraction pattern and to request Dr. McDowell to personally come to the bedside to evaluate the patient and prepare for a c-section delivery.

C.     Failure after 0645, to timely communicate with Dr. McDowell that the tachysystolic contraction pattern continued despite fluid boluses, and that Ms. Greene's 10/10 pain continued despite pain medication;

D.     Failure of midwife Talley to stay with Ms. Greene after shift change at about 0700, when she knew or should have known that Ms. Greene was at risk for a placental abruption, or alternatively, to transfer the care of Ms. Greene and her baby to another nurse midwife until Dr. McDowell or another physician arrived at bedside to initiate a c-section delivery.

E.     Failure of midwife Talley or any other midwife to whom she transferred the care and monitoring of Ms. Greene, to timely use the chain of command to intervene on Ms. Greene's behalf when they knew Dr. McDowell was unwilling or unavailable to perform a timely c-section.

12.     After a thorough review of the above-stated documents and based on my education, experience, knowledge, and training as detailed herein, and in consideration of the information available regarding Greenena Greene's obstetrical history and the course of her labor, it is my opinion that the deviations in the standards of care described above proximately caused the preventable still birth of Carson Greene Hinton, a viable, quick infant when Greenena Greene presented to Phoebe Sumter Medical Center on September 22, 2020. Had the deviations from the standard of care not occurred, Carson Hinton would have been born alive.

13.     After a thorough review of the above-stated documents and based on my education, experience, knowledge, and training as detailed herein, and in consideration of the information available regarding Ms. Greene's obstetrical history and the course of her labor, it is my opinion that Dr. McDowell deviated from the standards of care for obstetricians in her care and treatment of Greenena Greene and Carson Hinton in the following respects:

A.    Failure to come to the bedside to evaluate Ms. Greene and the condition of her baby when, at 0645, she was notified of the episode of fetal bradycardia, Ms. Greene's tachysystolic contraction pattern and significant pain unrelieved by medication.

B.    Failure to recognize, at 0645, that Ms. Greene's tachysystolic contraction pattern, significant pain unrelieved by medication, combined with the episode of fetal bradycardia were signs that of a placental abruption or risk of placental abruption.

C.    Failure to recognize, at 0645, that Ms. Greene needed an emergent c-section to avoid the risk of an in-utero fetal demise.

D.    Failure to arrange for coverage by another physician when she knew or should have known that Ms. Greene required an emergent c-section and she had another patient also in labor;

E.    Failing to arrange for coverage by a CNM with whom she could stay in contact, or assign a CNM to Ms. Greene after 0700 to allow for close monitoring of Ms. Greene and her baby until such time as Dr. McDowell could make arrangements for Greenena Greene's baby to be delivered by c-section.

F.    Assuming that because the baby had a good heart rate at 0645 and thereafter, that he was not at risk of in-utero fetal demise due to placental abruption under the circumstances.

G.    Assessing Ms. Greene and her baby as "stable" at 0900 and ordering an spinal when she knew or should have known that to do so would delay delivery, putting both mother and baby at risk of harm.

H.    Failure to timely perform a c-section.

14.    After a thorough review of the above-stated documents and based on my education, experience, knowledge, and training as detailed herein, and in consideration of the information available regarding Greenena Greene's obstetrical history and course of labor, it is my opinion that Dr. McDowell's deviations in the standard of care as described above

proximately caused the preventable still birth of Carson Hinton, a viable quick infant when Greenena Greene presented to Phoebe Sumter Medical Center on September 22, 2020. Had the deviations from the standard of care not occurred, Carson Hinton would have been born alive.

15.     All of my opinions stated herein are based upon reasonable medical probability.

16.     My conclusions in this matter are based upon methods and procedures of medical science and diagnosis.  The methods and procedures which I employed in reaching my opinions and conclusions set forth in this Affidavit are reliable and are utilized every day by obstetricians and midwives across the country in the evaluation of laboring patients, in recognizing the signs of placental abruption, and in deciding to deliver babies by c-section to avoid well-understood risks of in-utero fetal demise associated with placental abruptions.

17.     I further state, that to the best of my knowledge, I have never had any opinions disqualified in any administrative forum, court of law, or other proceedings, nor have I ever been disqualified as an expert witness. I have never been found guilty of fraud or perjury in any jurisdiction.

FURTHER AFFIANT SAYETH NOT.

_____.
Steven Pliskow, M.D.

STATE of FLORIDA
COUNTY of PALM BEACH

The foregoing Affidavit was sworn to and affirmed and subscribed before me, this 2 day of February, 2021, by Steven Pliskow, M.D., who is _____ personally known to me or who X produced Drivers License as identification

_____
Notary Signature

Notary Seal:

JONAJH C. WEBSTER
MY COMMISSION # GG 260486
EXPIRES: November 29, 2022
Bonded Thru Notary Public Underwriters